IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Industrial Packaging Supplies, Inc., ) | |
| ) | Civil Action No.1:18-cv-00165 |
| Plaintiff, ) | |
| ) | Honorable Manish S. Shah |
| vs. ) | |
| ) | |
| Matthew Channell and Axis Packaging, LLC, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF PRELIMINARY INJUNCTION**

### I. INTRODUCTION

Axis, a company founded by former IPS employees (Verified Complaint, ¶ 68) has undisputedly hired away no less than nine IPS employees. (Ex. A, Declaration of James R. Scarazzo.) Irrefutable evidence has been uncovered proving numerous former IPS employees / now current Axis employees engaged in a coordinated effort to steal a slew of confidential information and trade secrets, provide said confidential information and trade secrets to Axis, and cover their tracks thereafter beginning as early as April of 2017 and continuing through at least December 4, 2017. (Ex. A, ¶ 6.)

Channell was let go from IPS on October 13, 2017 after a palpable disengagement from his work was noticed by IPS. (Verified Complaint, ¶ 71.) After a suspiciously terse period of unemployment, lo and behold, Channell was hired by Axis on November 17, 2017. (Verified Complaint, ¶ 72.) Channell then contacted John England, a former sales manager at IPS (Verified Complaint, ¶ 38), in an attempt to find a new job. (Response, Dkt. 20, Ex. B, ¶ 11.) England "put [Channell] in touch with Geordy Davidson, who hired [him] to work for Axis. Id. Channell has admitted IPS identified "maybe 10 to 12 additional prospective customers" for

1

Channell during his employment with IPS. (Response, Ex. B, ¶ 7.) Channell further admitted he "developed two customer accounts that actually purchased products from IPS" while he was employed by IPS. (Response, Ex. B, ¶ 8.) Channell only passively indicates he did not obtain business from one of these two customers prior to joining IPS. (*Id*.)

This Court must enjoin Axis and Channell from certain acts in violation of IPS's rights pursuant to a written and enforceable Non-Disclosure, Non-Solicitation, and Non-Competition Agreement (Ex. B.) (the "Agreement") between IPS and Channell, in violation of the Illinois Trade Secrets Act (the "ITSA"), and the Defend Trade Secrets Act (the "DTSA") as requested in IPS's Memorandum In Support of Motion for Preliminary Injunction ("Opening Brief"). (Opening Brief, Dkt. 5, p. 19.) Defendants are working their way through IPS's employee directory and customer contact rolodex in a systematic manner in violation of the above contract and Acts. IPS will suffer irreparable harm if this flagrantly tortious behavior is not halted by the Court.

## II. ARGUMENT

Defendants obfuscate the issues throughout their Response and consistently misstate case law and provide irrelevant authority. IPS is seeking a preliminary injunction. It does not have the burden of proving its whole case at this stage. Rather, IPS is entitled to the have the preliminary injunction granted if it demonstrates: 1) a likelihood of success on the merits; 2) a lack of an adequate remedy at law; and 3) that irreparable harm will result if the injunction is not granted. <u>Leen v. Carr</u>, 945 F. Supp. 1151, 1155 (N.D. Ill. 1996) (citation omitted). Thereafter, the court must weigh the irreparable harm IPS is likely to suffer against the harm Defendants will suffer if the injunction is granted. *Id.* (citation omitted).

A. **There Is A Likelihood That IPS Will Succeed On The Merits Of Its Case**

1.  **Defendants Purported Rule That Asserting Certain Aspects Of A Complaint On "Information And Belief" Bars Injunctive Relief Is Specious And Unfounded**

Defendants cite the unpublished case of *Kinney v. Federal Security, Inc.* 2001 U.S. Dist. LEXIS 2301 *2, n. 2 (N.D. Ill. March 6, 2001) to suggest IPS is not entitled to injunctive relief because IPS's complaint was pleaded in part based on "information and belief." (Response, p. 9.) This case deals with a TRO, which naturally relied on an affidavit given its emergency posture. As will be demonstrated, a host of evidence supports IPS's positions. *Kinney*, 2001 U.S. Dist. LEXIS 2301, n. 2. Defendants further cite *Maclean-Fogg Co. v. Edge Composites, L.L.C.*, No. CIV.A. 08 C 6367, 2009 U.S. Dist. LEXIS 31267 * 6 (N.D. Ill. Apr. 14, 2009) for the proposition allegations made on "information and belief" that a former employee disclosed trade secrets "are insufficient to state a claim under the Illinois Trade Secrets Act." (Response, p. 9.) However, the court in *MacLean-Fogg Co.* actually says "[a]llegations <u>based exclusively on information and belief</u> are insufficient <u>unless the facts are inaccessible to the pleader, and there is a reasonable basis to suspect the facts are true</u>." *MacLean-Fogg Co.*, 2009 U.S. Dist. LEXIS 31267 * 6.

As Mr. Scarazzo states in his declaration, Axis employees have taken deliberate actions to prevent IPS from gathering <u>all</u> of the relevant facts. After resigning on October 16, 2017, former IPS employee / current Axis Employee Jason Nettles downloaded software to hide his file activity, downloaded IPS passwords, downloaded a program to hide unauthorized activities, and advised another former IPS / current Axis employee, Cory Perry, to wipe data from his computer. (Ex. A, ¶ 12(a) and Exhibit 2 thereto.) Computer aided design ("CAD") drawings belonging to IPS were found present on former IPS / current Axis employee Quinn Davidson's phone, the last of which was taken on December 1, 2017 (*Id.*) Quinn Davidson had previously

3

opened and synchronized CAD drawing files on November 28, and 29. (*Id.*) Quin Davidson resigned on December 4, 2017. (*Id.*)

Cory Perry, another former IPS / current Axis employee, resigned from IPS on October 24, 2017. (*Id.* at ¶ 12(d).) He installed a program called AppCleaner, a program that thoroughly uninstalls evidence of applications having been installed previously, to his computer as early as April 6, 2017. (*Id.*) The program was run on October 23 and 24 of 2017. (*Id.*) Perry synchronized a file belonging to IPS regarding brand awareness to a personal account of his on September 1, 2017. (*Id.*) Perry printed documents titled "cperry-resignation-ips.docx" and "Cory Perry-Axis Offer Packet.pdf" on October 23, 2017. (*Id.*) There is also evidence of numerous former IPS / current Axis employees inserting USB drives, copying files, deleting files, and the like in the days surrounding their resignations and prior thereto. (*Id.* at ¶ 12.) Furthermore, former IPS / current Axis employee Michael Schmitt resigned from IPS on October 24, 2017. (*Id.* at ¶ 12(e).) Schmitt transmitted IPS data from his IPS, iPack.com account, to his personal Gmail account. (*Id.* at ¶ 12(e) and Exhibit 4 thereto.)

There is also evidence proving John England, Channell's former sales manager at IPS, and Geordy Davidson, Axis' founder, President, and the person who hired Channell to work for Axis, communicated to plan Davidson's resignation in April of 2017. (*Id.* at ¶ 12(c) and Exhibit 3 thereto.) This brief recitation is by no means meant to be exhaustive. Much more detail is provided in Mr. Scarazzo's declaration. The overwhelming evidence, which will be set forth at the eventual evidentiary hearing regarding a permanent injunction, shows conclusively that a coordinated effort was made by Axis to tortuously interfere with IPS's contracts with its employees as well as to steal IPS's trade secrets and other confidential information. (*Id.* at ¶ 14.)

4

Defendants were being disingenuous when they said IPS was not likely to be successful on the merits due to the nature of its pleadings. IPS attempted to investigate Channell's computer and other electronic equipment as well. However, FTI Consulting, the company who performed the forensic investigations on behalf of IPS, did not obtain Channell's computer before it was reconfigured by IPS following Channell's dismissal. (*Id.* at ¶ i.) IPS was not expecting a coordinated attack by the very people it trusted and did not discover Channell had begun working for Axis until it was too late. (*Id.*) IPS is actively hunting down the remaining facts and is, for good reason, convinced Channell will be discovered to have harmed IPS in the same vein as his mutinous colleagues. More information regarding the forensic investigation will be forthcoming in greater detail. (*Id.* at ¶ 15.) It is by no means hyperbole to say there is a reasonable basis to suspect the allegations in IPS's complaint against Channell are true given what is presently known. *MacLean-Fogg Co.*, 2009 U.S. Dist. LEXIS 31267 * 6. How Defendants can continue to criticize IPS for not presently having all of the facts Defendants have actively endeavored to hide remains to be seen. The argument is utterly confusing given what has come to light.

    2.    **Breach Of Contract**

There is a likelihood IPS's breach of contract claim against Channell will be successful on the merits. Defendants cite an unpublished opinion to suggest restrictive covenants are repugnant. (Response, p. 6.) This Court surely needs no direction on the credence, or lack thereof, it should grant such a case. Instead, the Court should look to the Illinois Supreme Court's decision in *Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, which held that while "a contract in total and general restraint of trade" is void as injurious to the public and promisor, "it is equally established that a restrictive covenant will be upheld if it contains a

reasonable restraint and the agreement is supported by consideration." *Id.* at 16. A restrictive covenant is enforceable if it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Id.* at ¶ 17 (citations omitted). Type of activity, geographic area, and time may limit a legitimate business interest. *Id.*

> The general rule, which Defendants fail to recite in their Response, is that:
>
> In the case of a postemployment restraint, where the employer-promisee exacts from the employee a promise not to compete after termination of the employment, the restraint is *usually* justified on the ground that the employer has a legitimate business interest in restraining the employee from appropriating the employer's (1) confidential trade information, or (2) customer relationships.

*Id.* at ¶ 34. Defendants correctly indicate "[f]actors to be considered in [the legitimate business interest] analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* at ¶ 43; (Response, p. 7.) However, the strategic omission of the *Reliable Fire Equip. Co.* Court's holdings immediately before and after this language is telling. Immediately prior to making this statement, the Court invalidated the previous two-factor "*Kolar*" rule, "in which a near-permanent customer relationship and the employee's acquisition of confidential information through his employment" were determinative. *Id.* The Court instead adopted a test based on the "totality of the facts and circumstances of the individual case." *Id.* Immediately after making the statement quoted by Defendants, the Court held "[n]o factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case." *Id.* The Court expressly observed appellate court precedent applying the "nature of the business" test to determine permanency of customers, as well as other tests and factors for the legitimate business interest analysis. *Id.* at ¶ 38, 42

(citing *Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 292 Ill. App. 3d 131, 142 (2d Dist. 1997)).

In *Lawrence*, the court indicated a near-permanent relationship would be present where the nature of a plaintiff's business engenders customer loyalty by providing unique products or personal services. *Lawrence*, 292 Ill. App. 3d at 142. The court also indicated business engaged in sales generally does not involve near-permanent customers. In their respective declarations, Channel and Geordy Davidson plant a token flag on an issue their counsel must have seen coming. Strangely enough, both Channell and Davidson make the exact same unique statement, declaring "There are hundreds of companies that can distribute packing materials, including, for example, boxes, pallets, packing film, wraps, strapping, foam, air pillows, etc., to customers. These materials are largely standardized products that can be generally sourced from the same group of venders, who work on a non-exclusive basis with the distributors." (Response, Ex. A, ¶ 2); (Response, Ex. C, ¶ 3).

The content of this declaration is curious given what Axis' website has to say. Below is a list of claims made on Axis' website, which destroy the integrity of this position and the credibility of the phony declarations.

- "We've learned over the years that many packaging companies can sell you packaging, but very few can provide the solutions that are agile enough to adapt to the needs of thriving companies." Ex. C, Are you ready to discover a better packaging process?, AXISPACK.COM, available at https://www.axispack.com/packaging-strategy/ready-discover-better-packaging-process/.
- "More often than not, your packaging is just as important as the product it protects. It's the first interaction with the customer, and it's also how your product gets from point A to point B." Ex. D.
- "Analyzing your packaging process to define your company's unique needs and priorities is where we begin the packaging consultation process." Ex. E, Packaging Consultation, AXISPACK.COM, available at https://www.axispack.com/packaging-services/packaging-consultation/.
- "Off-the-shelf solutions are rarely ideal; you need a solution that is customized to your process. You need a packaging company with the experience to identify problems and

- implement solutions." Ex. F, Home Page, AXISPACK.COM, available at https://www.axispack.com/.
- "We have been around long enough to know that packaging isn't merely buying a roll of tape or a bundle of boxes at the lowest price. As a result, we understand that packaging design, in its fullest sense, is a cornerstone of the success of a product. That's why our team at Axis Packaging thrives on challenge. Bring us into the trenches with you. We will excavate your current packaging design process, and build a strategy that you can be confident in." Ex. G, About Axis Packaging, AXISPACK.COM, available at https://www.axispack.com/about-axis-packaging/.

For the record, IPS agrees wholeheartedly. Packaging is part of the marketing process and can drive up the price a business is able to sell its goods at. What's the difference between a $.99 bottle of water and a $4.00 bottle of water? Not the ingredients. Neither IPS nor Axis is a "distributor," as Defendants now claim. The companies engineer customer solutions to serve their customers' logistics and supply chain management needs. As Axis makes clear on their website, there isn't anything standard about packaging anymore either. These services are highly technical. IPS's barrier in keeping competitors from poaching their business is built squarely upon the unique needs of its customers. IPS considers this knowledge to be its competitive advantage and went to great lengths to protect its confidential information, including its customer lists. Axis has itself proved customers in this industry are near-permanent by proclaiming publically that customers in the space have unique needs. *Lawrence*, 292 Ill. App. 3d at 142.

Defendants cite *Gastroenterology Consultants of N. Shore, S.C. v. Meiselman*, 2013 IL App (1st) 123692, ¶ 14 for the proposition that "when an employee continues to do business with his pre-existing customer contacts, those continuing business relationships do not create a protectable interest for the employer." (Response, p 7.) Defendants again misstate the law and do not accurately cite an opinion they purport to be authoritative. The plaintiff in *Meiselman* argued the circuit court applied the "near-permanent" test repudiated in *Reliable Fire Equip. Co.* instead of the appropriate "totality of the circumstances" test. *Meiselman*, 2013 IL App (1st) 123692, ¶ 10. The court disagreed, noting the circuit court had considered a whole host of

8

factors, including time and location restrictions and whether the employee misappropriated any confidential information he acquired while working for the plaintiff after he quit. *Id.* at ¶ 11. The court **did not** hold there was no protectable business interest merely as a result of the employee's prior business dealings with the customers. It held the facts regarding the prior business dealings, coupled with the lack of evidence presented by the plaintiff on the issue, evidenced that the plaintiff did not establish a near-permanent relationship. *Id.* at 14. The court's conclusion that there was no protectable business interest in the customers was based on the totality of the circumstances. *Id.* at ¶ 10. Defendants demonstrate a consistent confusion regarding this distinction. Another factor indicating a near-permanent relationship with customers in the industry is that the evidence proves Axis did in fact misappropriate IPS's trade secrets, in a concerted manner. (Ex. A, ¶¶ 7-15.) To reiterate, Channell did also, of his own volition, agree that the restrictive covenants were "necessary for the legitimate business interests of IPS." (Agreement, § 18.)

Defendants further argue there is no reasonable likelihood of success on the breach of contract claim as the Agreement was effectively voided by terminating Channell before Channell had worked for IPS for a substantial period of time. (Response, p. 10.) Defendants cite *Brown & Brown, Inc. v. Mudron*, 379 Ill. App. 3d 724, 728 (3d Dist. 2008) as recognizing Illinois courts have generally held two years of continued employment to constitute adequate consideration for a restrictive covenant to be valid. (Response, p. 10.) However, the Illinois Supreme Court **has not** held there is a two year rule. *Avison Young-Chicago, LLC v. Puritz*, No. 17 C 0844, 2017 WL 5896887, at *5 (N.D. Ill. Nov. 29, 2017). Importantly, federal courts in Illinois are bound to predict how the Illinois Supreme Court would rule; they are not obligated to follow the suggestions of lower state court opinions. *Id.* Including the *Puritz* court, six federal courts in the

9

Northern District of Illinois (and one in the Central District) have predicted the Illinois Supreme Court would reject a rigid two-year rule in favor of the flexible, fact-specific approach. *Id.* Nothing in the case law suggests the Illinois Supreme Court would enact a bright line rule hinging on whether an employee's employment ended voluntarily. Despite what Channell says, he was not let go out of nowhere. IPS let Channell go after seeing a tangible decline in Channell's work engagement persist for an extended period of time. (Verified Complaint, ¶ 72.) Just like the other eight former IPS employees, Channell went straight to work for Axis. (Response, Ex. A, ¶ 11.) Adequate consideration existed. Channell cannot be allowed to escape the obligations under the Agreement by architecting their purported inapplicability through getting fired after neglecting his duties in favor of a competitor.

The totality of the circumstances demonstrate conclusively that the Agreement, and the restrictive covenants, are valid, that the restraints were reasonable and not injurious to the public or unduly burdensome to Channell, and that a legitimate business interest exists. IPS is likely to succeed on the merits as a result.

    **3.    Misappropriation Of Trade Secrets**

Defendants take issue with IPS's citation to the "inevitable disclosure" theory. (Response, p. 12.) Regardless of what Defendants suggest, the law is that a "plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). The First District Appellate Court of Illinois agreed with *PepsiCo Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1070 (1st Dist. 2000). One way to prove inevitable disclosure is to show an employee copied the employer's confidential information. *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734 (N.D. Ill. 2011) (citation omitted).

Courts also consider: (1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. *Id.* at 734-75.

There may be no smoking gun demonstrably proving Channell <u>himself</u> copied IPS's confidential information. However, many of his colleagues undeniably did. (Ex. A, ¶¶ 7-15.) One could be forgiven if, by observation, he understood copying and/or misappropriating IPS's confidential information to be a prerequisite to employment at Axis. Nevertheless, if imitation is the most sincere form of flattery then hiring away nine employees from a competitor and looting its confidential information must be the most arduous level of competition. Channell's declaration shows he had the same sales and business development responsibilities at IPS as he currently has at Axis. (Response, Ex. B, ¶¶ 3, 7-8, 11-18.) Finally, as demonstrated by the forensic investigation, not only has Axis failed to take action to prevent Channell from using or disclosing IPS's confidential information, it took affirmative actions to make sure Axis's files were stuffed to the gills with IPS' valuable confidential information. (Ex. A, ¶¶ 7-15.)

Even if it cannot be proven at this early stage that Channell has already misappropriated IPS's confidential information, all the factors are met with ease and this Court must assume there will be an inevitable disclosure.

**B.    Irreparable Harm Will Result If An Injunction Is Not Granted As There Is No Adequate Remedy At Law**

Defendants claim IPS only had two customers in Illinois and therefore could "readily calculate damages if it turns out that Mr. Channell improperly impaired [IPS's] relationships with these businesses." (Response, p. 14.) Defendants provide no authority holding that the

11

number of customers dictates whether irreparable harm will result without an injunction or whether there is no adequate remedy at law. However, Illinois law holds that a no adequate remedy at law exists for a loss of competitive position. *Cross Wood Products, Inc. v. Suter*, 97 Ill. App. 3d 282, 286 (1st Dist. 1981). Indeed, an injury is irreparable where it is difficult to calculate the true extent of the loss. *See, e.g.*, *Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 599 (7th Cir. 1984).

An overwhelming amount of case law shows the courts uniformly presume irreparable harm in situations just like the present. *See Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (finding no adequate remedy at law and an irreparable harm would result where the defendant was alleged to conspire to establish a competitor); *Refractory Technology, Inc. v. Koski*, No. 90 C 4350, 1990 WL 119560, at *3 (N.D. Ill., Aug. 13, 1990) (Duff, J.) (dissemination of trade secrets would cause plaintiff immediate, irreparable harm). This Court has previously held that "Irreparable injury is presumed to occur when an ex-employee breaches a confidentiality agreement or a restrictive covenant." *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1339 (N.D. Ill. 1990) (holding further that irreparable harm adequately demonstrated because defendant had misappropriated plaintiff's trade secret and was likely to continue doing so). Illinois law further holds that "[o]nce a protectible interest has been established, injury to plaintiff will presumably follow if that interest is not protected." *Donald McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285, 294 (1st Dist. 1979).

IPS will suffer irreparable harm for which there is no adequate remedy at law unless the Court enjoins Defendants from disclosing and/or using IPS's confidential information and trade secrets that have demonstrably been misappropriated by one or both of the Defendants. (Ex. A, ¶¶ 7-15.) Axis is systematically attacking the core of IPS's business in flagrant violation of

Channell's Agreement, the DTSA and the ITSA. It is undisputed that Channell has already violated his Agreement by working for Axis in the first place. If Channell and Axis are allowed continued access to IPS's confidential information, then IPS's business will continue to be harmed to a significant extent. The disclosure of even a single trade secret is sufficient to cause irreparable harm. *PepsiCo*, 1996 WL 3965, at *30 (citing *Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1191-92 (5th Cir. 1984) ("It is not the number of trade secrets taken that determines whether the threat of irreparable harm exists. The fact that a trade secret may be disclosed is enough.") (citation omitted).

Davidson formed Axis with the intent to misappropriate IPS's confidential information and trade secrets and tortuously interfere with its contracts by hiring IPS's employees away, something that has happened at least nine times now. (Ex. A, ¶¶ 7-15.)

C.     The Balance Of Harm Weighs In Favor Of Granting A Preliminary Injunction

Neither Channell nor Axis would suffer any harm should the preliminary injunction be granted. This is because neither Channell nor Axis has the right to use confidential information or trade secrets belonging to IPS. Rather, the course of conduct from the Defendants demonstrates without a shadow of a doubt that IPS will be in continuous peril should Defendants be granted free rein to solicit IPS's employees and divert its business. Channell's Agreement is reasonable. IPS expended significant time and money establishing a Chicago location, something Channell and Axis fails to consider. The record demonstrates clearly that Defendants consciously disregarded Channell's Agreement, the DTSA, and the ITSA.

Defendants suggest that Channell would be harmed if the preliminary injunction is granted. The reality is that IPS exerted a great deal of time and energy training Channell. (Verified Complaint, ¶¶ 33, 35, 37-39.) As Channell has admitted, IPS provided "maybe 10 to

13

12 additional prospective customers" to Channell during his employment with IPS. (Response, Ex. B, ¶ 7.) This Court should enjoin Channell from applying to those customers, and any other customers he developed contact with while at IPS, the wealth of knowledge and expertise obtained when the Defendants misappropriated IPS's trade secrets and confidential information.

**D. Defendants' Arguments Regarding Interlocutory Mandatory Injunctions Are Irrelevant**

Defendants attempt to confuse the issues by citing wholly irrelevant case law regarding mandatory injunctions (the most strongly worded quotes used by Defendants come from unpublished cases, one of which does not even contain the alleged quotation). (Response, pp. 5-6.) Defendants suggest IPS's requested injunction goes "well beyond merely seeking to preserve the status quo." (Response, p. 5.) Defendants failed to consider the mandatory requirements of the aptly named Mandatory Initial Discovery Pilot ("MDIP") when making this comment, as the MDIP requires Defendants to produce, as part of the initial disclosure, requested information "as to facts that are relevant to the parties' claims or defenses, whether favorable or unfavorable." (MDIP Standing Order, Ex. H hereto, § A(1)(b).) The concerns cited in Defendants' Response as requests (a), (b), and (c) are therefore irrelevant as Defendants are already required to comply with them. (Response, p. 5.) This case law is also irrelevant to what is cited as requests (d) and (e) (Response, p. 6) as these cases deal with mandatory injunctions and these requests are prohibitory, rather than mandatory, in nature. The second point of confusion here is that a mandatory injunction orders a party to take actions whereas a prohibitory injunction orders a party to refrain from taking certain actions. *See Meghrig v. KFC W., Inc.*, 516 U.S. 479, 479 (1996). Defendants are further mistaken to the extent they suggest IPS's request for attorney fees, cited as request (f), involves its request for a preliminary injunction. (Response, p. 6.) IPS requested a separate Order requiring Defendants to pay its attorneys' fees – a request based on

14

Section 10 of Channell's Agreement. (Agreement, § 10.) Defendants' attempt to create a higher burden regarding the requested belief should be swapped aside as nothing more than a red herring.

                                              Respectfully submitted,

                                              /s/ Stephen W. Heil
                                                  Stephen W. Heil
E-Mail Address: swh@crayhuber.com
Federal Bar No. 6204266
Nicholas S. Graber
E-Mail Address: nsg@crayhuber.com
Federal Bar No. 6323975
CRAY HUBER HORSTMAN HEIL & VanAUSDAL LLC
303 West Madison, Suite 2200
Chicago, Illinois 60606
Telephone: (312) 332-8450
Facsimile: (312) 332-8451

William H. Foster (*pro hac admission pending*)
E-Mail Address: bill.foster@nelsonmullins.com
Federal Bar No. 6221
NELSON MULLINS RILEY & SCARBOROUGH
104 South Main Street / Ninth Floor
Post Office Box 10084 (29603-0084)
Greenville, South Carolina 29601
Telephone: (864) 250-2300

*Attorneys for Plaintiff Industrial Packaging Supply, Inc.*

February 15, 2018